## UNITED STATES v. HARVEY STEEL COMPANY.

### APPEAL FROM THE COURT OF CLAIMS.

No. 275. Argued January 3, 4, 1905.—Decided January 16, 1905.

The United States made a contract with the steel company for the use of a process described as patented. The contract provided that in case it should at any time be judicially decided "that the company was not legally entitled under the patent to the process and the product the payment of royalties should cease. In a suit by the company for royalties the United States attempted to deny the validity of the patent while admitting there was no outstanding decision against it. *Held,* that this defense was not open.

*Held further,* that under the circumstances of this case, the contract, properly construed, extended to the process actually used even if it varied somewhat from that described in the patent.

THE facts are stated in the opinion.

Mr. *Assistant Attorney General Pradt* for the United States:

The Court of Claims ignored the fact that the contract called for the steel company to furnish a patented process and that in so doing it not only warranted the validity of the patent but made an express agreement that there should be no liability on the part of the United States for royalties if the patent were judicially declared invalid. There is no estoppel against the United States asserting that the patent is invalid. Through the adoption of the process by the Government the company not only received $96,000 but the value of the process was demonstrated and made known to the world and thus enabled the company to make contracts with foreign governments.

The contention of claimant that a licensee cannot set up the invalidity of the patent does not apply to this case. Walker on Patents, 3d ed. § 307. Such a holding would practically nullify the principal provision of the contract. Nor is it true that the validity of the patent can only be questioned in an action for infringement. Such an action is impossible in this case as the only users of this patent in this country are those building ships for this Government. The clause cannot properly be construed to apply to a case in which the manufacture of armor plate for the United States should be enjoined in an action for infringement by parties claiming under some patent, and asserting that the Harvey patent was invalid, because if the agents of the United States were thus enjoined, that fact itself would amount to an eviction and bring the contract to an end and thus render the clause superfluous and useless. Walker on Patents, 3d ed. § 307; *Am. Electric Co.* v. *Gas Company,* 47 Fed. Rep. 43; *Consumers' Gas Co.* v. *Electric Co.,* 50 Fed. Rep. 778. The essential element in estoppel that the claimant has changed his position for the worse is wanting.

If the patent was valid it was so narrow as not to include the process actually used.

There is no ambiguity in the contract and it is not permissible to consider circumstances and negotiations leading up to the

contract. 17 Am. & Eng. Ency. of Law, 2d ed., 23; *Spring-steen* v. *Samson*, 32 N. Y. 703; *Muldoon* v. *Deline*, 135 N. Y. 150; *Railroad Co.* v. *Trimble,* 10 Wall. 367; *Davis* v. *Shafer,* 50 Fed. Rep. 764.

*Mr. James R. Soley* and *Mr. Frederic H. Betts* for appellee:

The court below did not err in refusing to enter into an examination of the state of the prior art to determine whether the Harvey patent was valid or invalid. A party who has contracted to pay royalties for the use of a patented process with full knowledge of what he was contracting for, and who has had the benefit of the use of such process, cannot resist payment of such royalty on the plea that the patent granted is invalid. A license under a patent never implies a warranty of validity. 3 Robinson on Patents, 692; Walker on Patents, 4th ed., 305; *Stott* v. *Rutherford,* 92 U. S. 107; *Kinsman* v. *Parkhurst,* 18 How. 289; *Eureka Co.* v. *Bailey Co.,* 11 Wall. 488; *Crossley* v. *Dixon,* 10 H. of L. Cas. 306.

The validity of a patent cannot be determined in a suit against licensee for royalties, nor can the holder of a license deny the validity of a patent which he enjoys under it. *Moore* v. *Boiler Co.,* 84 Fed. Rep. 346; *Birdsall* v. *Perego,* 5 Blatch. 251; *Sargent* v. *Larned,* 2 Curtis, 340; *Marsh* v. *Dodge,* 41 Hun, 278; *Bartlett* v. *Holbrook,* 1 Gray, 118; *Marston* v. *Sweet,* 66 N. Y. 207; *Pope Mfg. Co.* v. *Owsley,* 27 Fed. Rep. 105; *Marsh* v. *Harris Co.,* 63 Wisconsin, 283; *Magic Ruffle Co.* v. *Elm City Co.,* 13 Blatch. 151.

In order to construe the clause relating to the validity of the patent as requested by the Government it would be necessary to disregard all well settled rules of construction. *Charter Gas Engine Co.* v. *Charter,* 47 Ill. App. 36.

No contract for the use of a patent right upon the payment of royalties would create a monopoly unless it was a contract for an *exclusive* use, which this was not. But the principle that a licensee, acting under a license, is estopped from setting up the invalidity of the patent as a defense in a suit for royalties

is just as applicable whether the license is for the exclusive use or for any partial use, or, as in this case, for such use as the licensee desired. *Marston* v. *Swett*, 82 N. Y. 526, 533.

The Court of Claims committed no error in declining to examine the prior art in order to construe the patent, as in an action for infringement. The Government has admitted it used the Harvey process. Greenleaf on Evidence, 6th ed., 207; and it well knew what it had contracted for and what it received by its license and is now estopped from denying it used the process. *Eureka Co.* v. *Bailey Co.*, 11 Wall. 492; *Hobbie* v. *Smith*, 27 Fed. Rep. 659; *Andrews* v. *Landers*, 72 Fed. Rep. 670; *Sproull* v. *Pratt & Whitney*, 97 Fed. Rep. 809. The Court of Claims, in fact, found that the process used was that described in the Harvey patent.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a claim for royalties upon a contract made between the parties to the suit under the following circumstances: The Harvey Steel Company is the owner of a patent, numbered 460,262, for a process for hardening armor plates and for armor plates. After careful experiments, made by the Navy Department, before the patent was granted, a contract was made on March 21, 1892, the material elements of which are these: It recited that the company was the owner of the patented rights to a process "known as the 'Harvey process' for the treatment of armor plate for use in the construction of vessels;" an agreement that armor plate "treated under the said 'Harvey process'" shall be applied to certain vessels; the previous giving of an option to the Navy Department "of purchasing the right to use and employ the 'Harvey process' for treating armor plates, as follows: 'We hereby agree to give to the Navy Department an option for the purchase of the application of the Harvey process for treating armor plates, which was tested at the Naval Ordnance Proving Ground, Annapolis, Md., February 14, 1891,'" on terms set forth, one of which

was that Harvey, the inventor, should furnish all details in his possession, or which he might develop in the perfection of his methods; the acceptance of the offer by the Navy Department; and an agreement by the United States to pay the expense of applying "the said process," etc. The contract then went on to agree that the United States, upon the terms stated, might use "the hereinbefore-mentioned process known as the 'Harvey process,'" gave the company a royalty of one-half of one cent a pound up to $75,000, when the royalty was to cease, and stated other terms.

This contract had conditions for further tests, etc. Numerous further experiments were made, and on October 8, 1892, the company was informed by letter that "the Harvey process for armor plate has been definitely adopted by the Navy Department." In pursuance of the offer mentioned in the contract, the Navy Department required and received from Harvey a revelation of the secret process and improvements, and thereafter, on April 12, 1893, the parties made a new contract upon which this suit is brought. This recited, as before, that the company was owner of the patented rights to a process "known as the Harvey process," and referred to the patent by number and date. It then recited the making of the agreement of March 21, 1892, "whereby the party of the first part granted to the party of the second part the right to use and employ the Harvey process aforesaid," etc. It then canceled the old contract, and agreed that, in consideration of $96,056.46 royalty, the United States might use "the aforesaid Harvey process" for all naval vessels authorized by Congress up to and including July 19, 1892, and further, that it might use the "aforesaid Harvey process" upon vessels authorized after that date, "paying therefor" a half a cent a pound. The company covenanted to hold the United States harmless from further claims, and from demands on account of alleged infringement of "patented rights appertaining to said process;" to furnish full information regarding the composition and application of the compounds employed in the Harvey process,

and all improvements which it might make upon "said process as covered by the aforesaid letters patent," and that the United States might adopt and use such improvements. Finally, it was agreed that "in case it should at any time be judicially decided that the party of the first part is not legally entitled, under the letters patent aforesaid, to own and control the exclusive right to the use and employment of said process, and the decrementally hardened armor plates produced thereunder, as set forth in the letters patent aforesaid, then the payment of royalty under the terms of this agreement shall cease, and all sums of money due the party of the first part .from the party of the second part, as royalty for the use and employment of said process, and armor plates, as aforesaid, shall become the property of the party of the second part."

The United States has built battle ships armored by the Harvey process communicated to it, and, subject to the questions which will be mentioned, by the terms of the contract there was due a royalty of sixty thousand eight hundred and six dollars and forty-five cents, to which sum the Court of Claims found the claimant entitled. 38 C. Cl. 662. It never has been judicially decided that the claimant has not the rights mentioned in the last quoted clause of the contract. The United States asked additional findings, which, it now contends, would establish that the patent was invalid, or, if valid, valid only if restricted to the use of a heat above 3100° Fahrenheit, in which case the patent was not used by the United States. These findings were refused as immaterial and the United States appealed. The main question is whether, under the last quoted clause of the contract, the United States can set up the invalidity of the patent in this suit. It is argued also that the United States ought to have been allowed to show that it had not used the patent, properly construed, although it is not denied that it has used the process communicated to it and known in common speech as the Harvey process.

It is not argued that there was a technical entire failure of consideration. The claimant was under continuing obliga-

tions, which it is not suggested that it did not perform or is not still performing, and one of which, the imparting of its secret information and improvements, it had performed under the original agreement, out of which the last contract sprang. The argument is put mainly on the construction of the clause quoted, coupled with the further argument that the United States ought not to be estopped as licensee to deny the validity of the patent because it is not a vendor but simply a user of the patented article, and therefore has not enjoyed the advantage of a practical monopoly, as a seller might have enjoyed it even if the patent turned out to be bad. This distinction between sale and use, even for a non-competitive purpose, does not impress us. So far as the practical advantage secured is matter for consideration, whether a thing made under a patent supposed to be valid, is used or sold, it equally may be assumed that the thing would not have been used or sold but for the license from the patentee. We regard the clause in the contract as the measure of the appellant's rights.

The words of the condition on which the payment of royalty was to cease, taken in their natural and literal sense, do not mean what the Government says. A plea of that condition, to satisfy the words "in case it should at any time be judicially decided" that the patent was bad, would have to be that it had been decided to that effect. It would not be enough to say that the defendant thought the patent bad, and would like to have the court decide so now. We see no reason to depart from the literal meaning of the words. It is argued that so construed they are very little good to the United States, since private persons would not use the armor plates, and the more the United States used them the larger would be the royalties which the company received, so that it would have no motive, even if it had a right, to sue the makers of the plate. It is answered that armor was made for foreign governments, and that the makers were sued by the claimants in good faith, although, as it turned out, the final decrees were entered by consent.

And it is argued on the other hand that the Government's construction would.put the claimants at a great disadvantage, and would be giving up all benefit of the patent at the moment it was issued.  We do not amplify the considerations of this sort on one side or the other.  They are too uncertain to have much weight.  The truth seems to be that the proviso is a more or less well-known and conventional one in licenses, *Charter Gas Engine Co.* v. *Charter,* 47 Ill. App. 36, 51, not a special contrivance for the special case, and that fact alone is enough to invalidate attempts to twist the meaning of the words to the interest of either side.  The proviso was inserted, no doubt, on the assumption that a licensee, when sued for royalties, is estopped to deny the validity of the patent which he has been using, and to give him the benefit of litigation by or against third persons, notwithstanding that rule.

We have somewhat more difficulty with the other question mentioned.  It is argued that the agreement was only to pay for the use of the process covered by the patent named, and that if the meaning of the parties was to cover anything broader than the patent, even what was known in their speech as the Harvey process, that meaning could be imported into the contract only by reformation, not by construction of the contract as it stands.  But we are of opinion that this defense also must fail.  In the first place, it is not fully open on the record.  The findings asked had a different bearing.  All that were asked might have been made without necessitating a judgment for the United States as matter of law and the court believed that the difference between patent and process was trivial.  But we should hesitate to admit the defense in any event.  The argument is that at the time of the contract it was supposed that the heat required for the process was greater than that actually used, that the patent was valid only for a process with the greater heat, and that the contract covers no more than the patent.  But the fact that the parties assumed that the process used and intended to be used was covered by the patent, works both ways.  It shows that they thought

and meant that the agreement covered and should cover the process actually used. We think that this can be gathered from the agreement itself apart from the mere supposition of the parties. The contract dealt with a process "known as the Harvey process." It imported the speech of the parties and the common speech of the time into the description of the subject matter. The words, Harvey process, commonly are put in quotation marks in the first contract, thus emphasizing the adoption of common speech. They mean the process actually used. The contract states that it is dealing with the same thing that had been the subject of the former agreement. That agreement further identified that subject as a process which was tested at the Naval Ordnance Proving Ground. It also identified it, it is true, as a patented process, but, if the incompatibility of the two marks is more than trivial, as it was regarded by the court which found the facts with which we have to deal, the identification by personal familiarity and by common speech is more pungent and immediate than that by reference to a document couched in technical terms, which the very argument for the United States declares not to have been understood. It is like a reference to monuments in a deed. As we have said, this identification by personal experiment and by common speech is carried forward into the contract in suit. The latter contract manifests on its face that it is dealing with a process actually in use, which requires the communication of practical knowledge and which further experience may improve.

We have not thought it useful to do more than indicate the line of thought which leads us to the conclusion that the claimant must prevail. We have confined ourselves to the dry point of the law. It might have been enough to say even less and to affirm the judgment on the ground that the findings asked and refused, so far as they were not refused because not proved, were only grounds for further inferences, not a special verdict establishing the defense as matter of law. But the fuller the statement should be made the more fully it would

appear that the United States was dealing with a matter upon which it had all the knowledge that any òne had, that it was contracting for the use of a process, which, however much it now may be impugned, the United States would not have used when it did but for the communications of the claimant, and that it was contracting for the process which it actually used—a process which has revolutionized the naval armor of the world.

*Judgment affirmed.*