Booth, Judge,
dissenting:
The allegations of the petition in this case disclose a suit founded upon an express contract to pay royalties for the use of a patented method- for drying smokeless powder. In describing the various steps of a detailed method, claimed as original, it is difficult to make it clear, apart from the apparatus employed to effectuate it, especially so where the method claimed is so slight a deviation from ones of a similar character long in use. Smokeless powder grains vary in size and are formed “ from a soft, plastic mass which owes its condition to a considerable content of alcohol and ether, this combination of fluids being familiarly referred to as the ‘ solvent.’” The plastic mass thus formed is forced through a perforated die, resulting in long strips of the same, similar to macaroni. After cutting said strips into the desired lengths it becomes indispensable to reduce the solvent in the powder from 40 to at least 5 or 6 per cent. This is accom- • plished by a drying process. To dry the powder and reduce the ether-alcohol solvent is manifestly free from much difficulty, involving at best a considerable length of time and the wasting of the ether-alcohol solvent, but to dry the powder quickly, reduce the solvent, and save a large percentage of the latter for future use involves the exercise of the inventive genius. To this particular phase of the matter the plaintiff directed his especial attention.
The specifications and various claims of the patents in suit, . if -I correctly apprehend them, cover a single novel conception in this particular art. I say this because of the express disclaimer set forth in the second paragraph of plaintiff’s Letters Patent No. 763,387, wherein express recognition is *322 acknowledged of previous and used methods, differing only from the patentee’s method in this one particular feature and which we believe to be further confirmed by the long and somewhat tedious passing of the claims to patent by the Patent Office. Starting, then, with the conceded fact that a closed circuit comprising a drying chamber, a means of heating the air therein to a vaporizing temperature; likewise a fan to cause the circulation of the heated air in the circuit, as well as a condenser employed to reduce the temperature of said heated air and thereby recover the ether-alcohol solvent and dry the powder, were in use and well known, the issue is somewhat simplified by ascertaining from the record in what particular did the plaintiff change this established method in a way that is new and novel, for which he was granted letters patent, and which, in so far as this suit is concerned, is fully covered and protected by the same. In other words, what is his patented method ?
The officers of the defendant had not been idle, nor had previous inventors failed to recognize the necessity for a method of accomplishing the very purpose the plaintiff set out to accomplish, and this is made more emphatic by the long list of patents set out in Finding X depicting the state of the art.
Eesorting first to the claims of the plaintiff’s letters which in law are required “ for the very purpose of making the patentee define precisely what his im-ention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms” (White v. Dunbar, 119 U. S., 47, 52), and then contrasting and comparing them with the prior state of the art, fixes the scope of the invention granted in the Letters Patent, as well as positively identifying the real invention.
The defendant in 1900 was using a method for reducing the ether-alcohol solvent and drying smokeless powder which consisted of the introduction of atmosphere into a closed circuit apparatus erected by a combination of the following parts. The powder was deposited into three separate powder containers connected, respectively, by pipes to the closed circuit, in which the atmosphere was duly heated in a heating chamber, and kept in circulation by a fan, thus projected *323 downwardly through the powder chambers, after leaving which the solvent-laden air passed into a condensing chamber, where by the sudden change of temperature it was relieved of its solvent vapors, the ether and alcohol collected, and the air passed on for a repeated circuit of the same operation. This method of evaporating and saving a material portion of the ether-alcohol content of the powder was continued for about, or perhaps, a year’s time, when it was abandoned on account of excessive leakage in the pipes caused by the great number of connecting joints, necessary to join the various parts of the apparatus together in forming the closed circuit. Thereafter, so far as the record discloses, the defendant accomplished nothing of material value in evolving an efficient method until subsequent to 1903, when the plaintiff submitted his method.
Claims one of plaintiff’s Letters Patent describe a predominating feature which differentiates it from the method employed by the Government prior to this time, and seems to me to define the scope and identity of his patented method covered by said claims, which, in so far as these claims are concerned, sets forth the real invention. It is, to use in part the language of the claims, “ producing a vapor-laden atmosphere ' in a space containing substance to be dried,” and then by the same processes heretofore described, starting and continuing the circulation of said vapor-laden atmosphere until the same “ is saturated with vapor,” under the exclusion of ambient air, after which it is condensed in the cooling temperature of the condensing chamber, and the solvent saved. The method so described was effectuated by introducing in the bottom of the powder container a coil capable of being used as both a cooling and a heating device. With this device used first as a heater — the plaintiff says “condenser heater ”— the powder is heated and the atmosphere above being confined to the powder chamber, becomes vapor laden. After the atmosphere becomes thus vapor laden the device used to confine it in the powder chamber is released, and the same is caused to pass downwardly through the powder into a space on a lower level, the condenser heater having in the meantime been converted from a heating to a *324 cooling coil, whereby the vapor-laden atmosphere is relieved of a part of its vapor, then passed on in the closed circuit to a point where a fan takes it up, projecting it into a second heating device, thus restoring its lost heat, after which it again proceeds to the powder chamber, to repeat its tour of the closed circuit. The claimed merit of the method is said to be an appreciable saving of the solvents, as well as the drying of the powder to an even degree throughout its entire bulk. The plaintiff insists that by first obtaining a vapor-laden atmosphere in the space occupied by the powder to be dried, he thereby maintained throughout the subsequent journeys of said atmosphere around the closed circuit a certain degree of uncondensed volatiles within said atmosphere which kept the powder moist, and prevented a surface crust thereon, drying it from the inside'out, and thus effecting a larger condensation of the ether and alcohol, which had not therefore been done without the admission of ambient air to the closed circuit. Claim one, then, as I view it, is limited by reference to the claim and specifications to the creation of a vapor-laden atmosphere in the space occupied by the powder, i. e., the powder chamber. It obviously could not be otherwise and attain the dignity of invention. The defendant never at- any time used the method covered by claim one.
This conclusion is rested upon what claim 1 discloses as the primary conception of the inventor, for which novelty is claimed, and certainly can not be extended to include more than an alleged original method whereby a vapor-laden atmosphere is first brought into being inside the space occupied by the powder and continued in circulation until it becomes saturated, so as not to at any time condense the full proportion of the ether-alcohol solvent, thus retaining sufficient quantity of the solvent in the atmosphere to maintain the necessary degree of moisture in the powder itself to prevent crustation. The inventor by express language sustains the same by himself specifying provisions for introducing outside vapors, if necessary, to sustain this very atmospheric condition.
Claim 2 of the plaintiff’s method, as appears from Letters Patent No. 763,387, is much broader, and when read in connection with the method used by the defendant from 1910 *325 to 1916, known as the “ box type,” seems to so clearly approach it that their identity becomes merged. Treating the invention relied upon by the plaintiff as strictly a method patent, it would be difficult indeed to differentiate the method employed by the defendant from the one described in claim 2. Claim 2 is not ambiguous; the language of the claim is obviously free from need of construction to ascertain the meaning of the same, and, inasmuch as the case is concededly a contract one, its validity is not involved. The Patent Office passed the claim; it is broad and comprehends the very method employed by the defendant to attain the results attained by the “ box type ” device. The “ box type ” device, as to two features, is conceded in the .defendant’s brief to anticipate claim 2 of plaintiff’s patent, and the defendant’s expert witness accurately portrays the method in language so decidedly apt as to warrant the conclusion that the methods are identical. The machines were decidedly different; the method seems identical. In the “ box type ” device the atmosphere is first heated to a vaporizing temperature, passes into the top of the box or powder chamber, where it. comes into contact with powder and becomes saturated with the ether-alcohol solvent, and it then passes downward through the powder, through the condensing chamber into a chamber on a lower level where it is relieved of a portion of the solvent, and then up again to the heating chamber, restoring its lost heat whereupon the process is repeated to the exclusion of ambient air. This method was used by the defendant from 1910 to 1916. United States v. Harvey Steel Co., 196 U. S., 310.
The letter of March 26, 1903, from Admiral O’Neil to the plaintiff, as set forth in Finding Y, precludes the denial of an existing contract between the parties if the plaintiff met all the conditions of the same. It seems to me that the Government is put in the rather awkward situation of seeking to repudiate a contract to pay for the use of a patented invention “ if it works satisfactorily to the bureau,” because the findings specifically disclose that after various ex-perimentations they returned in the end to the use of the apparatus disclosed in claim 2 to them by the plaintiff and which was, in the first instance, of sufficient importance to *326 excite their immediate attention and interest. The only-issue presented for our determination, as held in the case of United States v. Harvey Steel Co., supra, is whether the defendant used the invention covered by the plaintiff’s letters patent, and the only purpose of going into the prior art is to ascertain what the invention was.
For the reasons above stated I am unable to agree with the opinion of the court, but am firmly convinced that the plaintiff is entitled to recover.