23 N.J. Super. 28 (1952)
92 A.2d 487
LOUIS B. LeDUC, PLAINTIFF-RESPONDENT,
v.
J.T. BAKER CHEMICAL COMPANY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1952.
Decided November 17, 1952.
*30 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Louis B. LeDuc, pro se.
Mr. Roger T. McLean argued the cause for the defendant-appellant (Messrs. Woodruff J. English, Henry W. Foulds, Jr. and Arthur C. Hensler, Jr., on the brief and of counsel; Messrs. McCarter, English & Studer, attorneys).
The opinion of the court was delivered by EASTWOOD, S.J.A.D.
The basic question involved in this matter is the interpretation or construction of the patent license agreement between the parties.
The case was tried before the Superior Court, Law Division, and a jury. A verdict for the stipulated amount ($12,500) of the royalties allegedly due under the agreement was returned in favor of the plaintiff. The defendant appeals from the trial court's denial of its motion for summary judgment and from the ensuing judgment.
On August 10, 1943 United States Patent No. 2,326,303 was issued to Frank N. Moerk and George M. Eisenberg for an invention relating to the treatment of organic substances such as sewage, industrial wastes, and the like. Thereafter Dr. Eisenberg worked with Joseph Metzendorf, an employee of the defendant company, on an adaptation of the invention for the production of penicillin. Their joint efforts brought about the construction of a deep fermentation tank in which culture media was supplied to the fungus known as penicillin chrysogenum, resulting in the production of the well-known antibiotic penicillin. A patent application was about to be made therefor by Messrs. Eisenberg and Metzendorf, when the license agreement of November 24, 1944 was made. Later, a patent was issued and conformably to the agreement was assigned to the defendant company. On August 7, 1950 A.M. Stackhouse, as trustee for the beneficiaries of Patent No. 2,326,303, assigned and transferred to the plaintiff said patent and the invention *31 covered thereby and said license agreement. Later, Mr. LeDuc instituted this action for the recovery of alleged due and unpaid royalties.
The agreement in question was executed by H.H. Garis, president for the defendant company, and A.M. Stackhouse, as trustee for the beneficiaries of the patented invention, granting to the defendant a non-exclusive license to use the patented invention "for the submerged or deep-tank fermentation process as applied to organic substances other than sewage or industrial waste"; in the agreement, A.M. Stackhouse renounced for himself and associates all interest in the invention of Dr. Eisenberg and Joseph L. Metzendorf covering specifically penicillin; it was provided therein that the licensor would grant similar agreements to companies designated by the defendant for the use of the invention "for submerged or deep-tank fermentation process" as applied to organic substances other than sewage or industrial waste; and for the payment of royalties and the basis for computation thereof, for all products "made by the submerged or deep-tank fermentation of organic substances covered by the aforesaid patent." (Italics ours). The italicized phrase was inserted in the agreement by Mr. Garis, president of the defendant company.
The distinctive feature of both the plaintiff's patented process and apparatus is a circulatory system by which the flora and the nutrient medium are maintained in continuous and intimate contact, thereby inducing fermentation of the sludge. The apparatus designed for this purpose was a vertical cylindrical tank with a conical bottom, from which by means of an external pump the contents of the tank were drawn out, and recirculated, mixed with air, to the upper portion of the tank through a pipe that led tangentially into the tank and thus set up a spiraling or vortical movement of the mass until it was again withdrawn at the bottom.
In the defendant's operations for producing penicillin it employs a portion, but less than the whole, of the invention patented. In the place of an open tank that would ordinarily *32 be employed in processing sewage or industrial waste, the defendant employs a closed or sealed tank as is required for the production of penicillin to prevent contamination. It is also asserted that a modified type of agitator was employed as an adaptation for penicillin production.
At the conclusion of the trial, defendant moved for judgment in its favor on the ground that the agreement imposed royalty obligations only for operations "covered by" the patent and that the evidence indicated that the process and apparatus employed by defendant was not that patented by plaintiff and, therefore, there was no issue of fact for determination. The trial court denied defendant's motion and charged the jury that it was not requisite that defendant embrace all the elements of claim patented by plaintiff to become liable for the payment of royalties, but that it was sufficient if its operations or apparatus employed a portion of any patented claim.
In its argument for a reversal of the judgment the defendant contends that the patent claims, as registered in the United States Patent Office, determine what is "covered by the patent"; that all operations or apparatus except those within the monopoly of the patent, as defined in the claims, are excused from royalty payments; that plaintiff's patent claim embodies approximately five claims; that defendant's operations and apparatus employed less than the whole of plaintiff's patent claims and, therefore, it is not subject to royalty payments under the license agreement. Further, it argues that each element of the claim is material and necessary to the patent and that any combination of process or apparatus which does not include every such element is not the patented invention and is not "covered by the patent."
The defendant contends further that it was error for the trial court to deny its motion for judgment at the end of the case; that its obligation to pay royalties depended upon use of the apparatus or operations covered by the patent as explained in the patent claims; that the evidence clearly demonstrated that it did not make use of the patent as *33 claimed and that the trial court erroneously and prejudicially charged the jury that it was not necessary that defendant use every element of plaintiff's patented invention before incurring liability under the royalty agreement, but that use of less than the entire patented invention adapted to production of penicillin was sufficient to produce liability.
The plaintiff denies the allegations of error advanced by the defendant and argues that defendant was liable for payment of royalties for the limited use which it could make of the patented invention, i.e., "the submerged or deep-tank fermentation of organic substances," which was induced essentially by the plaintiff's patented circulation system; that the whole purport of the agreement was to exclude those elements of the claims which dealt with sewage treatment and include those appropriate to production of penicillin; that a license to use a patent on a royalty basis carries with it liability for the licensee for any degree of use made thereof, be it in whole or in part; that if the agreement be construed in this light, the degree of use made by defendant is unimportant and that use of the essential elements of the patented invention was sufficient to impose liability under the agreement.
The specific language of the agreement provided for the payment of royalties for use of the patented "submerged or deep-tank fermentation of organic substances" in the production of products other than sewage and industrial wastes, "covered by the aforesaid patent." Therefore, grammatically speaking, "covered by the aforesaid patent" applies to "products" produced by the "submerged or deep-tank fermentation of organic substances." It is not denied that the fermentation process and apparatus which embodied the circulating system as used by the defendant was the system described in the patent.
Defendant has devoted a considerable portion of its brief and argument to the meaning of the phrase "covered by the patent," and it contends that this phrase is commonly used in patent law in the technical sense of "covered by all *34 the components of any claim of the patent," citing a number of cases in support thereof. The plaintiff does not seriously challenge defendant's construction of the term, stating that the use of the phrase is common in defining the test of patent infringement, but that it does not follow that because that phrase is frequently used in this technical sense in other license agreements, that it was so used by the parties to the agreement sub judice. We agree with the trial court that the issue must necessarily be determined from a construction of the agreement between the parties. As stated in Sbicca-DelMac, Inc., v. Milius Shoe Co., 145 F.2d 389, 400 (C.C.A. 8, 1934), where the court was considering an action for the recovery of royalties:
"* * * we are not concerned with the technicalities of the patent law as we were in considering the questions of validity and infringement involved in the first cause of action. The liability of the defendant for royalties is to be determined by the terms of the license contracts."
In 69 C.J.S., Patents, sec. 249, pp. 770, 771 and 772, we find this statement:
"The rules applicable to the construction of contracts generally apply to the construction of license agreements. Such contracts will be construed according to the intention of the parties as expressed in the contract as a whole or as shown by the conduct of the parties, and their practical construction is entitled to great weight, at least where the language is ambiguous. A construction of a license agreement which would destroy its vitality should be avoided if possible."
Our review of the record does not indicate that this was an extraordinary agreement or one which is recognized to have employed the use of other than ordinary terms, i.e., those imparting generally recognized meanings without the aid of the lexicon or special manuals of definition.
"Words will be given their ordinary meaning when nothing appears to show that they are used in a different sense and no unreasonable or absurd consequences will result from doing so. Words chosen by the contracting parties should not be unnaturally forced beyond their *35 ordinary meaning or given a curious, hidden sense which nothing but the exigency of a hard case and the ingenuity of a trained and acute mind can discover. * * *" 12 Am. Jur., Contracts, sec. 236, pp. 758, 759.
Our courts have consistently held to this rule. See Heuer v. Rubin, 1 N.J. 251 (1949); Moses v. Edward H. Ellis, Inc., 4 N.J. 315 (1950); Matlack v. Arend, 2 N.J. Super. 319, 325 (Ch. Div. 1949); Maryland Casualty Co. v. Hansen-Jensen, Inc., 15 N.J. Super. 20, 27 (App. Div. 1951); Washington Construction Co., Inc., v. Spinella, 8 N.J. 212, 217 (1951).
It is clear that the parties to the contract did not contemplate the use of all factors or elements of the patent, but that liability was to arise from the use of any part thereof by the defendant. The contract excludes the use of the patent for "sewage or industrial waste," and it is not seriously disputed that the parties understood that the patented invention was to be employed in the production of penicillin. It is also conceded by the parties that penicillin cannot be manufactured by the use of an open tank; that under such circumstances, it would be subject to contamination from the air. With knowledge of the fact that the licensee contracted for the use of the invention for the manufacture of penicillin and that portions or parts of the patented invention could not be used in the production of penicillin, we do not think it can be successfully asserted that the use of only those portions of the process and apparatus that were adaptable to the production of penicillin was not intended to be the use that was licensed by the agreement of November 24, 1944, for which royalties were to be paid. Any other construction would reduce the words of the contract to a nullity and would not grant to them their ordinary and apparent meaning. There is no indication that the words of the contract were to carry the meaning contended for by the defendant. The agreement of the parties would be meaningless if we were to hold that it required 100% use of the various parts of the process and *36 apparatus patented, for it was understood by the parties prior to the establishment of the agreement that parts of the patented invention could not be used in the production of penicillin. To construe the contract as contended by defendant would, indeed, employ a strange, forced and unnatural meaning contrary to the apparent intent of the parties thereto. If, as the defendant contends, it could lawfully use a part of the patented process or apparatus, without infringing plaintiff's patent, there was then no necessity for any contract whatever.
It is argued that the phrase "covered by the patent" was inserted for the protection of the defendant and that the meaning of these words has been construed to support defendant's position. If these words present any ambiguity  and we do not think they do  we feel that it should be resolved against the defendant who caused their insertion without disclosing a special meaning to be attributed thereto. It is stated in Moses v. Edward H. Ellis, Inc., supra:
"The party who drafted the contract and is responsible for its ambiguities `has no right to induce another to contract with him on the supposition that his words mean one thing, while he hopes the court will adopt a construction by which they would mean another thing more to his advantage.' Fletcher v. Interstate Chemical Co., supra. The responsibility here sought to be imposed would not be lightly assumed by the plaintiff, who had no control over the excavations easily made by blasting but difficult and expensive of repair by concrete. Such a penalty will not be created nor spelled out by mere inference when it is not clearly and unequivocally expressed in the contract itself."
The plaintiff argues with, we think, considerable merit, that the license agreement permitted the limited use of the elements of the patented invention appropriate or adaptable to the production of penicillin and excluded those elements of the patented claims which dealt with sewerage or industrial wastes. Licensing of less than the entire claim of the patent, or a single component thereof, as in the matter sub judice (the submerged or deep-tank fermentation of organic substances), is not precluded by law, and in such *37 instance the patent is nevertheless protected. Alexander v. American Encaustic Tiling Co., 100 N.E. 809, 811 (Ct. App. N.Y. 1913).
And, similarly, it has been recognized by the highest courts of the land, that use of even a limited portion of the elements of the patent claims, under a general license imposes liability for the payment of royalties upon the licensee. The United States Supreme Court in two decisions involving the same license agreement reached a conclusion directly opposed to the contention of the defendant. Harvey Steel Co. v. U.S., 38 Ct. Cl. 662, 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492 (1905), 46 Ct. Cl. 298, 227 U.S. 165, 33 S.Ct. 258, 57 L.Ed. 464 (1913). Here the patent covered what was known as the "Harvey process" for treating armor plates. The United States was given the right to use this process "as particularly set forth in Letters Patent of the United States 460, 462," for which it was to pay a stipulated royalty. Payment of royalties was later refused on the ground that "the heat required for the process was greater than that actually used, that the patent was valid only for a process with the greater heat and that the contract covers no more than the patent." The Court of Claims sustained the licensor and on appeal the Supreme Court affirmed, saying:
"The fact that the parties assumed that the process used and intended to be used was covered by the patent works both ways. It shows that they thought and meant that the agreement covered and should cover the process actually used. We think this can be gathered from the agreement itself * * *."
Later, the Government again refused payment of royalties on the ground that one element in the claim of the Harvey patent had been omitted in the use of the process. The patent claim stipulated, among other elements, the "enclosing a low steel plate between a mass of non-carbonaceous material on one side and a mass of granular carbonaceous material firmly backed upon the other side." When it was *38 discovered that this step was unnecessary and because it was not used, liability for royalties was disclaimed. The Supreme Court affirmed the rejection by the Court of Claims of this defense saying:
"The government received all that it had bargained for * * * and was at liberty to use the process, little or much, in whole or in part."
There is supporting precedent in New Jersey. In Ferry-Hallock Co. v. Progressive Paper Box Co., 76 N.J. Eq. 1, 3 (Ch. 1909), affirmed per curiam, Ibid. 338 (E. & A. 1909), the license agreement under the patent granted, among other things, the right to use both "rings" and "stays." The contention was made that since "stays" were not used the stipulated royalties were not due. The court said:
"In the present case, the agreement granted the right to use the Hallock machines for rings and fixed the royalties for both rings and stays on a basis which did not depend on the actual making of either stays or rings, and these entire royalties are due, under the agreement, if the defendants use any of the privileges conferred by the license, and do not expressly repudiate them all."
Cf. Eclipse Bicycle Co. v. Willard M. Farrow, 199 U.S. 581, 587 (1905).
We are of the opinion that the intention of the parties was to license the use of the patented invention for the production of penicillin with full knowledge that all of the several elements of the invention could not be used in the product of penicillin, and that for the employment of those that could be used by the licensee, a royalty was to be paid.
In Casriel v. King, 2 N.J. 45, 50, 51 (1949) it is said:
"* * * The polestar of construction is the intention of the parties to the contract as disclosed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are to be regarded. Even when the contract on its face is free from ambiguity, evidence of the situation of the parties and the surrounding circumstances and conditions is admissible in aid *39 of interpretation. * * * And the general design of the agreement is to be kept in view in ascertaining the sense of particular terms. Corn Exchange National Bank & Trust Co. v. Taubel, 113 N.J.L. 605 (E. & A. 1934); New York Sash & Door Co. Inc., v. National House and Farms Association, Inc., 131 N.J.L. 466 (E. & A. 1944); Mantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379 (E. & A. 1947). In short, we are to consider what was written in the light of the circumstances under which it was written, and give to the language a rational meaning consistent with the expressed general purpose."
The trial court's action in denying defendant's motion for judgment in its favor was proper, it being the court's finding that the contract did not contemplate the use of all elements of the patented invention and it being the intention of the parties that liability for royalties arose with the use of a part of the patented invention.
It is our view that the question presented in this matter was a legal one, i.e., the construction of the license agreement. This issue had already been decided by the trial court when the matter was submitted to the jury, and while it was error to submit the case to the jury in that posture, no injustice was occasioned in view of the fact that the jury in its verdict, reached the same conclusion as the court. There being no factual issue, were we to remand the case to the trial court, it would be solely for the purpose of directing the court itself to return a verdict in favor of the plaintiff and enter judgment there. Such procedure, we find, unessential.
The judgment, as entered, is affirmed.