Walter M. KRANTZ, Plaintiff,

v.

Richard W. VAN DETTE and Virgil P. Van Dette, Defendants.

Civ. A. No. 30956.

United States District Court
N. D. Ohio, E. D.

Sept. 5, 1958.

---

Conder C. Henry, Washington, D. C., Lee C. McCandless, Butler, Pa., J. M. Modarelli, Youngstown, Ohio, for plaintiff.

Francis J. Klempay, Youngstown, Ohio, for defendants.

WEICK, District Judge.

In this action, Walter Krantz, an inventor, seeks to recover from Richard W. Van Dette and Virgil P. Van Dette, brothers, the sum of $350,000. He claims this amount is due him as accrued royalties under three license agreements whereby he granted to defendants the exclusive right to make, use and sell, in certain counties in Ohio and Indiana, storm windows described in plaintiff's nine applications for patent which had theretofore been filed in the United States Patent Office.

Royalties had been paid under the license agreements to September 1949, when defendants claim that they ceased to manufacture, use or sell plaintiff's storm window, or to use his trade mark.

Defendants claim that thereafter their storm windows did not embody plaintiff's inventions and that they owe no royalties to him. They also plead fraud and breach of the license agreements by plaintiff in failing to sue alleged infringers.

Jurisdiction of the Court was based on diversity of citizenship.

The parties waived a jury and the case was tried to the Court.

The license agreements herein were on mimeographed forms prepared by Krantz and his patent attorney, with typewritten matter inserted. Two of the agreements were dated May 26, 1947 and

the third agreement was dated December 1, 1947.

All three agreements contained substantially the same provisions except each agreement provided for different territory. In addition to licensing the patent applications, the agreements granted to the licensee the right to use the trade mark "Lite House".

The agreements provided that the licensee would pay Krantz "royalties in the amount of fifty cents (0.50) on each and every storm window made and sold by licensee in accordance with the disclosures of the hereinbefore mentioned Krantz patent applications."

In the license agreements, the nine applications for patent and the trade mark were described by serial number and the dates of filing in the Patent Office.

Subsequently the licensed applications for patent ripened into six patents which are numbered 2,504,700, 2,504,701, 2,-504,702, 2,505,553, 2,565,772 and 2,639,-769. Krantz later filed additional applications for patent which resulted in two patents numbered 2,551,017 and 2,-583,107 and were available for use by the licensee under the provisions of the license agreement.

The storm windows manufactured by defendants were of the double-hung type with interchangeable sash and screen frames for winter and summer use. Extruded aluminum was used for the metallic parts.

It was not claimed by Krantz that the accused storm window used by Van Dettes embodied the disclosures in all of his applications. Krantz claims that the accused storm window embodies the disclosures in some of his patent applications.

Van Dettes claim that the accused window embodies only inventions or prior art not owned by Krantz and, therefore, they do not have to pay him royalties for their use.

At the outset, Krantz claims that Van Dettes are estopped from asserting that the accused storm window is outside of the licensed applications because of the provisions of Articles 5 and 10 in the license agreements which are as follows:

Article 5. * * * Licensee agrees that it will use its best efforts to supply the demand for storm windows within the territory in which this license is granted.

Article 10. Licensee further agrees that any ideas or improvements, either in the storm window or apparatus for manufacturing the same, patentable or otherwise, acquired, designed or otherwise obtained by Licensee or any person or persons working for Licensee shall be considered to come under the terms of this agreement.

Article 5 assumes that a demand existed for the Krantz window. All the licensee agreed to do was to use his best efforts to supply it. Nowhere did the licensee agree to use his best efforts to create any demand. The agreements did not require the licensee to sell any windows. This is materially different from a covenant to mutually develop and exploit an invention. If there was any ambiguity in the article, it should be resolved in favor of the licensee. The licensor prepared the agreements and they should be construed against him. 69 C.J.S. Patents § 249.

There was no evidence of any demand for the Krantz window or that the licensee failed in any respect to supply it.

The fact is that the licensee did use his best efforts to promote the sale of the Krantz window from the date of the agreements until September 1949 and nearly went broke in so doing. It met with keen competition from other suppliers who sold aluminum storm windows for a lower price. The licensee reported its predicament to Krantz and urged him to redesign his window to make it lighter and cheaper in order to meet the competition. Krantz refused to do so.

The licensee was thus faced with a serious problem of continuing its unsuccessful and unprofitable operations with the Krantz window and going broke or securing a different, and commercially superior, window which would be com-

petitive and could be sold at a profit. It chose the latter course.

█ Article 10 applies only to improvements of the licensed window. It cannot be construed to relate to prior art or prior inventions in storm windows which do not belong to Krantz. Any other construction would permit Krantz to collect royalties on patents belonging to other inventors which he would have no right to license.

The justice of this position is made all the more clear when we consider the past activities and inventions of Krantz with respect to storm windows.

On October 3, 1945, Krantz sold and assigned, by direct and mesne assignment, to Ace Storm Window Company, nine prior applications for patents on improvements in storm windows. Krantz spent several months in the Ace plant to assist Ace in getting started in the storm window business.

In his assignment to Ace, Krantz not only assigned the nine specific patent applications, but also "all improvements which Walter M. Krantz may make to said storm window and/or corner construction * * * and/or frame and fastening means and/or corner construction and method of assembly and/or storm sash." (Deposition of Walter M. Krantz—Defendants Ex. "Z" Ex. "E" attached thereto)

These prior applications for patent were all pending in the Patent Office when the nine applications for patent involved in the Van Dette license agreements were filed. Krantz did not disclose to Van Dettes the fact that he had nine other applications for patent relating to storm windows which he had sold to Ace or that he had assigned to Ace all improvements which he may make to said windows.

Ace was a competitor of Van Dettes.

Counsel for Krantz made the admission in open court:

"I think we can shorten this testimony though, because we will admit that the Ace Window assembly is substantially identical with the accused device and also with the Krantz Exhibit No. 8." (Trans. p. 288)

Krantz Exhibit No 8 is a model of the Krantz storm window.

█ Having sold and assigned his prior applications for patent to Ace, Krantz ought not to collect royalties from Van Dettes on any of the disclosures contained in the patents which were later issued thereon and are owned by Ace.

Krantz urges that there was a confidential relationship existing between him and the Van Dettes whereby the royalty would be due irrespective of the above quoted provisions of the license agreements.

If such a confidential relationship had existed, Krantz should have disclosed to the Van Dettes his nine prior applications for patent and the sale to Ace, including the improvements. This he did not do.

Van Dettes have charged Krantz with fraud for failing to make the disclosure.

██ The Court does not find that there was any confidential relationship between the parties created by the license agreements or otherwise. The parties dealt at arms length. There was no duty to make the disclosure. There was no fraud.

By the same token, the license agreements are to be construed as not involving any confidential relationship between the parties.

Krantz relies on the case of Santa Cruz Oil Corp v. Albright-Nell Co., 7 Cir., 1940, 115 F.2d 604 in support of his contention that Van Dettes' redesigned window comes within the scope of the license agreements. The facts in the Santa Cruz case are set forth in a previous appeal of the same case reported in Allbright-Nell Co. v. Stanley Hiller Co., 7 Cir., 72 F.2d 392. The case involved an improvement patent developed by an employee of the licensee who had contracted to assign all inventions made by him to his employer.

Our case does not involve any improvement patent or any relationship of employer and employee, but merely the use of prior art and patents which licensor had previously sold to others.

This case does not involve any controversy between the parties over the title or ownership of storm window designs falling outside of the disclosures in the licensed applications, but only a dispute over royalties under the license agreements which specifically described the patent applications of Krantz.

■ Under the facts and circumstances of this case, Articles 5 and 10 of the license agreements may not be construed as enlarging the licensed inventions so as to embrace prior art or other inventions not owned by the licensor. There is no estoppel to prevent the licensees from showing that after September 1, 1949 they did not use the disclosures in Krantz's patent applications.

■ Under the law, the state of the art may not be used by a licensee to contest the validity of the licensed patent because he is estopped from doing this. Automatic Radio Mfg. Co., Inc., v. Hazeltine Research, Inc., 1950, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312; United States v. Harvey Steel Co., 1905, 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492; Enterprise Mfg. Co. v. Shakespeare Co., 6 Cir., 1939, 106 F.2d 800. But the state of the art may be shown to aid the Court in determining just what the licensee received by the license. Cf. Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 1924, 266 U.S. 342, 351, 45 S.Ct. 117, 69 L.Ed. 316; Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 1950, 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097.

In the Westinghouse case, the Supreme Court cited with approval the decision of the Court of Appeals in Noonan v. Chester Park Athletic Club Co., 6 Cir., 1900, 99 F. 90, 91, where Judge Lurton said that prior art may be used against an assignor of a patent on the issue of infringement "to show the state of the art involved, that the court may see the thing which was assigned and thus determine the primary and secondary character of the patent assigned, and the extent to which the doctrine of equivalents may be invoked against an infringer."

The licensee was certainly not required to pay Krantz royalties for the use of patents not owned by him or for prior art in the public domain which was free for either party to use.

■ The licensee was required only to pay royalties for the use of disclosures contained in the licensed applications for patent. Baldwin Rubber Co. v. Paine & Williams Co., 6 Cir., 1939, 107 F.2d 350; Western Electric Co. v. Robertson, 2 Cir., 1905, 142 F. 471.

This brings us to a consideration of the issue whether the accused window of Van Dettes falls within the disclosures of the licensed patent applications.

Although the license agreements undertook only to license the storm windows described and claimed in specific patent applications, none of the pertinent patent applications were offered in evidence. Only the patents which issued thereon are before the Court along with four prints of drawings as originally filed with four of the applications. It is from these patents and drawings that any conclusions must be drawn.

Only one expert witness, who appeared in behalf of Van Dettes, testified in the case. His testimony, although not conclusive, was to the effect that the licensed disclosures, in view of the prior art, must be narrowly construed and that the Van Dette window did not embody any of them.

Krantz's testimony was to the contrary, but it must be remembered that he is the inventor and did not claim to be expert in the interpretation of patents. A study of the patents and the model windows justifies the conclusion that the testimony of defendants' expert was much more persuasive.

Otto Saarman, one of Krantz's licensees from Detroit, who testified in his behalf, showed such a lack of familiarity with detailed construction features

of the window that his opinions were of little value.

Krantz claims that his Patent No. 2,541,926 assigned to Ace cannot be considered as prior art because the application therefor was filed on August 7, 1945 and the patent did not issue until February 13, 1951.

Krantz's nine applications for patent which he licensed to Van Dettes were filed in the Patent Office in 1946 and 1947 and were pending before patents issued on the nine applications for patent which Krantz sold to Ace.

Krantz made no claim as to any material changes being made in the applications sold to Ace before patents issued thereon.

■ As the assignor of the patents to Ace, Krantz is estopped from denying the validity of the patents. Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., supra.

■ By virtue of his assignment to Ace, Krantz divested himself of all ownership in the disclosures contained in the applications and he could not thereafter rightfully license the same disclosures to Van Dettes and collect royalties thereon.

■ The disclosures in the prior applications assigned to Ace on which patents have issued were necessarily considered by the Court in determining just what was embraced within the inventions licensed to Van Dettes.

■ In the light of the prior art and the applications for patent which had been assigned to Ace, the applications for patent licensed to Van Dettes cannot be considered as basic or of a primary character and hence are not entitled to a broad construction or a liberal application of the doctrine of equivalents. Noonan v. Chester Park Athletic Club Co., supra, 99 F. 94; Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., supra; Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., supra.

As stated by the Court of Appeals in Baldwin Rubber Co. v. Paine & Williams Co., supra, "The claims are not entitled to a broad and liberal construction, but on the contrary, the range of equivalents allowed must be so narrow as to include nothing which is not substantially identical with the means used by the applicant patentee." 107 F.2d at page 354.

Krantz Patent No. 2,505,553 relates to glass framing construction.

The principal parts of the storm window are the main frame, glass frame or sash and the screen frame. Originally these parts were made of wood, but Kaufmann (Patent No. 2,291,726), in 1940, disclosed an all metal storm window assembly which was formed of rolled metal.

Jorss, in 1935, taught the use of aluminum extrusions for framing sash, (Patent No. 2,120,614). Hermann disclosed the use of similar material for screen framing in 1945 (Patent No. 2,432,889), as did Schiller in 1943 (Patent No. 2,335,361).

Krantz Patent No. 2,541,926 issued on application filed August 7, 1945, which he sold to Ace, is a basic patent in storm sash construction. It provided for the insertion of a modifier in the main side rail extrusion into which the inwardly offset lower sash slides and which supports the upper sash. This patent disclosed substantially everything used in the accused window assembly except the construction of the storm sash and screen sash.

In plaintiff's brief at page 5, it is claimed that the accused glass window frame is substantially identical with the elements disclosed in the licensed Patent No. 2,505,553. He does admit that there is some difference, namely, "the web connecting the flange extends straight across between them * * *. The Krantz web is sharply diagonal in shape whereas Van Dettes form an H."

This difference is all important because the Krantz web forms two V shaped grooves which permit a distortion of the flanges. When the corner keys are locked in the bottom V this causes the top V to flex and engage the metal

spline or clip, which in turn presses against the glass and holds it in a firm position. This is the essence of the patent.

The straight line web used by Van Dettes is not shown to be flexible. The insertion of the corner keys in the bottom part does not cause the upper section of the flange to flex and exert gripping action on the glass.

Van Dettes used glue on the edges of the glass and a rubber or plastic spline to support the glass. By this arrangement only a part of the gripping action is supplied by the spline. This is very different from the Krantz arrangement where the glass is held in place solely by the pressure of the metal spline. Van Dettes could have used putty to hold the glass in place without embodying the Krantz disclosures.

Their use of resilient spline did not embrace any of Krantz's patents as it was old in the art as shown by Russell, (Patent No. 2,463,432) (1945) and Kohler, (Patent No. 919,887) (1909).

The use of corner keys is not a licensed feature, as they had been disclosed by Joras and Hermann.

Krantz Patents Nos. 2,504,700 and 2,583,107, which are included in the license, disclose a three channel side rail with two modifying members (referred to in the testimony as K-4 and K-5) inserted in the outer channels. In the '700 patent a wedge is forced into the center channel to hold the modifying members in place. In the '017 patent instead of using a wedge, a wrench is employed to distort the flanges of the center channel so as to lock the modifying members in the outer channels in place.

The extrusion used in the accused window as a modifier was in one piece, and is referred to in the testimony as a Z bar. If it resembles any Krantz patent at all it is the '926 patent sold to Ace. It does not use the disclosures in Patents '700 and '107.

Krantz Patent No. 2,639,769 covers the licensed screen frame which is made of aluminum extrusions held together by corner keys. It is an improvement of the screen Patent No. 2,427,915 which he had sold to Ace. In the '915 patent the screen is inserted in the H section frame. In the '769 patent the screen edge receiving groove was located in the face of the frame. This was disclosed by Hermann (2,432,889), Higgin (1,248,-858) and Watson (956,239) and was old in the art.

The only novelty in the '769 patent was serrations in the screen edge receiving groove of the frame to hold the screen in place.

The accused screen has no serrations, but instead employs an additional lip or ridge on either side of the channel. The additional lip or ridge in no way resembles the serrations in the Krantz patent.

Krantz Patent No. 2,504,701 relates to an expansible storm window. There was no testimony showing that Van Dettes utilized this disclosure in any respect. An examination of the exhibits before this Court fails to reveal any feature remotely resembling the patent claims.

The same holds true of Patents Nos. 2,504,702 and 2,565,772 covering mounting frames for storm windows and Patent No. 2,551,017 relating to a ventilating sill for storm windows.

 The Court concludes from all the evidence that the accused storm widow of Van Dettes does not embody the disclosures of the licensed inventions and that Van Dettes had the right to use the prior art and inventions without paying royalties to Krantz.

Krantz offered in evidence another license agreement dated April 23, 1953 involving the same inventions in which he was described as licensor, and Virgil Van Dette, Katherine Glimpse and Van Dette Manufacturing Co., an Ohio corporation, were the licensees. Richard W. Van Dette, one of the defendants here, was not a party to the new agreement. The license provided for additional territory and for royalties computed on the basis of one-half cent per

foot of extruded metal sections utilized in the manufacture of double-hung storm windows, casement windows and storm door inserts.

The agreement also provided for a minimum royalty which, if paid for five years, would result in a release of all claims on the license agreements in suit. $5,288 in royalties were paid to Krantz under this agreement.

If this agreement is still in effect then no action could be maintained by Krantz on the agreements in suit because of the substituted performance therein provided for.

Krantz claims that he verbally cancelled the agreement because of default of the licensee.

■ Since Krantz admits he cancelled the 1953 agreement, it could not be given effect for any purpose.

■ Krantz offered the agreement in evidence as an admission against interest because of recitals in it to the effect that the licensee therein was currently building windows embodying features of the Krantz inventions.

As an admission against interest it would be entitled to little weight as embodying only an opinion of a layman in respect of an involved patent matter.

The remaining issue in the case relates to damages.

The question involved is whether or not the sale of aluminum extrusions by Van Dette Manufacturing Co. to persons who manufactured them into storm windows and sold the completed window requires the payment of royalties under the license agreements assuming that the extrusions adopted features of the licensed patents.

The provision in the license agreements "for * * * royalties in the amount of fifty cents (0.50) per window on each and every storm window made and sold by the licensee * * *" means a window completely assembled and sold, and not merely a component part of it.

An aluminum extrusion is not a storm window. Krantz recognized that there is a difference between storm windows and extrusions because in the 1953 license agreement, which he cancelled, he stipulated for a royalty of "one half cent per foot of extruded metal sections utilized in the manufacture of such double hung windows, casement windows and storm door inserts as fall within the scope of the Patents."

Krantz claims that the rules relating to recovery of damages from infringers or contributory infringers in actions for patent infringement should be applied in the present action. Wallace v. Holmes, 9 Blatchf. 65, 29 Fed.Cas. page 74, No. 17,100; Belknap v. Wallace Addressing Machine Co., 2 Cir., 12 F.2d 597; National Brake & Electric Co. v. Christensen, 7 Cir., 38 F.2d 721; American Stainless Steel Co. v. Ludlum Steel Co., D.C., 16 F.2d 823, 825.

■ An action for infringement of a patent sounds in tort.

The measure of damages in a patent infringement action is governed by statute. Title 35 U.S.C.A. § 284.

■ The action in the case at bar is on contract to recover agreed royalties based on the manufacture and sale of storm windows. The license agreements do not comprehend the payment of the royalty stipulated for windows on merely the sale of a component part.

■ If plaintiff claims that the sale of extrusions by the Van Dettes infringed any of his patents, he has a remedy in a suit for infringement and accounting.

This memorandum is adopted as findings of fact and conclusions of law. An order may be prepared entering judgment for the defendants and dismissing the complaint at plaintiff's costs.